# EXHIBIT
# 1

KAREN P. HEWITT
United States Attorney
MELANIE A. ANDREWS
Special Assistant U.S. Attorney
28 U.S.C. 543
melanie.andrews@usdoj.gov
880 Front Street, Room 6293
San Diego, CA 92101-8893
Telephone: (619) 557-7460

Attorneys for Defendant
United States of America

UNITED STATES DISTRICT COURT

SOUTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| TIMOTHY D'ANGELO, Plaintiff, v. DONALD C. WINTER, SECRETARY OF THE NAVY Defendant. | Case No. 08cv0718 JAH(LSP) DECLARATION OF DIANA GAGNON-HOSKINSON |

DECLARATION OF DIANA GAGNON-HOSKINSON

I, Diana Gagnon-Hoskinson declare and state as follows:

1. I have personal knowledge of the statements made herein. If called as a witness, I could and would testify competently thereto.

2. I am the Western District Human Resources (HR) Manager for the Navy Exchange (NEX). I assumed this position in December 2007 but served as the Assistant HR Manager for the Western District since October 2004. Additionally, I been employed by the Navy Exchange since 1998, previously as an EEO specialist.

3. Currently, I oversee all employee relation issues for the approximately 1800 NEX employees located in my area of responsibility. My office recruits, assists with hiring and provides personnel

services for management and associates in areas including medical and retirement benefits, workers compensation, evaluations and discipline.

4. The Navy Exchange (NEX) is a federal governmental entity within the Department of the Navy that sells goods and services to military personnel, their eligible family members and authorized civilians. The NEX is also a non-appropriated fund instrumentality (NAFI) as it operates from the funds generated by the sales of its goods and services. NEX employees are compensated from the non-appropriated funds and are excepted service federal employees.

5. Volume 3, Publication 145, Chapter V of the Navy Exchange Manual is also known as the NEX HR Manual. A part of Chapter V is designed to provide avenues of redress for associates and managers who, as excepted service government employees, cannot seek relief from the Merit Systems Protection Board to challenge certain employment actions. Examples of avenues of redress include an administrative grievance and a two-step appeal where the second level of appeal is decided at the NEX headquarters level.

6. Timothy D'Angelo has been employed by the Navy Exchange since February 1999. His previous positions included serving as the General Manager of the La Maddalena Italy NEX from September 2003 to October 2006. In October 2006, Mr. D'Angelo was transferred to an exchange in the San Diego area.

I declare under penalty of perjury that the forgoing is true and correct.

Executed on 12 June 2008, at San Diego, CA.

DIANA GAGNON-HOSKINSON

# EXHIBIT 2

KAREN P. HEWITT
United States Attorney
MELANIE A. ANDREWS
Special Assistant U.S. Attorney
28 U.S.C. 543
melanie.andrews@usdoj.gov
880 Front Street, Room 6293
San Diego, CA 92101-8893
Telephone: (619) 557-7460

Attorneys for Defendant
United States of America

UNITED STATES DISTRICT COURT

SOUTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| TIMOTHY D'ANGELO,<br><br>Plaintiff,<br><br>v.<br><br>DONALD C. WINTER,<br>SECRETARY OF THE NAVY<br><br>Defendant. | Case No. 08cv0718 JAH(LSP)<br><br>DECLARATION OF<br>THOMAS JACOBSEN |

DECLARATION OF THOMAS JACOBSEN

I, Thomas Jacobsen declare and state as follows:

1. I have personal knowledge of the statements made herein. If called as a witness, I could and would testify competently thereto.

2. Since September 2007, I have been the General Manager of the Navy Exchange (NEX) at Naval Air Station North Island. The Fallbrook, Imperial Beach and Naval Amphibious Base Coronado Navy Exchanges also fall under my responsibility and in total approximately 350 to 400 personnel are employed by all of these Exchanges.

3. On February 8 and 11, 2008, senior NEX Loss Prevention Investigators David Imrie and Joe Box briefed me on an ongoing investigation involving thefts and inventory shortages that took place

at the La Maddelena NEX. Timothy D'Angelo, the Imperial Beach store manager, was the La Maddelena General Manager when these incidents occurred. Imrie and Box suspected that D'Angelo knew of the thefts of store merchandise and also received a personal gain by taking an unauthorized discount on store merchandise, accepting gifts from NEX vendors, making improper special orders of merchandise and giving Italian Nationals NEX gift certificates, all in violation of NEX policy. They planned to interview D'Angelo on February 12th.

4. Late morning or early afternoon on February 12th, Mr. Irmie informed me that during D'Angelo's interview, D'Angelo admitted to violating store policy, as suspected. At the close of the interview, Irmie, placed D'Angelo on suspension pending further action. As his supervisor, I followed up with a memo to D'Angelo, dated February 13, 2008, confirming the suspension without pay pending disciplinary action. My memo also informed D'Angelo that he could submit a grievance to me within ten days and in the event the suspension extended beyond 30 days he could submit an appeal to me within 45 days of the effective day of the suspension.

5. In my experience as Store Manager and General Manager of several NEXs, the emergency suspension pending disciplinary action has been used when an associate's conduct indicates that his retention might be detrimental to the interests of the Navy Exchange. In our February 11th meeting, Irmie, Box and I discussed that depending on the outcome of his interview, D'Angelo may be placed on emergency suspension.

6. D'Angelo did not grieve his suspension but rather his attorney forwarded an appeal to me on March 21, 2008. I denied the appeal and informed his attorney that my decision may be appealed to

the Commander, Navy Exchange Service Command (NEXCOM) within 15 days.

I declare under penalty of perjury that the forgoing is true and correct.

Executed on 12 June 2008, at Temecula, CA.

THOMAS JACOBSEN

# EXHIBIT
# 3

DEPARTMENT OF THE NAVY
NAVY EXCHANGE
P.O. BOX 357045
NAS NORTH ISLAND
SAN DIEGO, CALIFORNIA 92135-7045

Regular Mail – Certificate of Mailing

13 February 2008

From: General Manager
To: Mr. Timothy D'Angelo, 3118 Canon Street #2, San Diego, CA 92106

Subj: NOTICE OF SUSPENSION WITHOUT PAY PENDING DISCIPLINARY ACTION

Ref: (a) Navy Exchange Manual, Vol 3, Pub 145, Chapter V

1. This is to confirm the verbal suspension given to you on 12 February 2008. It has been determined that your retention might be detrimental to the interests of the Navy Exchange. You are advised therefore, in accordance with reference (a), you are being suspended from work without pay for an indefinite period.

2. If disciplinary action is warranted, this leave without pay period may be continued during the issuance of the advance notice of proposed disciplinary action, the notice of decision and until the effective date of the penalty.

3. If no disciplinary action calling for a loss of pay is warranted, you will receive your regular pay for the period during which you were on leave without pay.

4. If the final disciplinary action taken is less than termination, you will be paid for the time so suspended, less any loss of pay required by the disciplinary action.

5. You have a right to submit a grievance on the emergency suspension in accordance with reference (a). If you choose to do so, your grievance must be filed orally and/or in writing, to the undersigned within ten calendar days from receipt of this letter. In the event this emergency suspension without pay extends beyond 30 calendar days from its effective date, you have a right to appeal this action in accordance with reference (a). You may then submit a written appeal to the undersigned no later than 45 calendar days from the effective date of this action.

6. Grievance/appeals over an emergency suspension pending disciplinary action will only address the need for or the appropriateness of the suspension. If you have any further questions regarding emergency suspension grievance appeal rights and procedures please contact Mr. Evan Johnson, Employee/Labor Relations Specialist, at (757) 440-4725.

T. JACOBSEN

# EXHIBIT
# 4

# NEXCOM

# HUMAN RESOURCES POLICY

# MANUAL

# FOR NAVY AND

# MILITARY SEALIFT COMMAND

# EXCHANGES

Navy Exchange Manual
Volume 3
Publication 145

APPENDIX IV-E PRESENTATION OF RETIREMENT CERTIFICATES, LETTERS OF APPRECIATION (LOA), AND SERVICE AWARDS

1. Purpose
2. Policy
3. Retirement Procedures
    1. Preparation of Retirement Procedures
        a. NEXCOM Headquarters
        b. Field Servicing Human Resource Offices (HRO)
4. Preparation of Letter of Appreciation
    a. NEXCOM Headquarters
    b. Field Locations
    c. Sample Letter of Appreciation
5. Presentation Ceremony
    a. NEXCOM Headquarters
    b. Field Locations
6. Service Awards Procedures
    a. NEXCOM Headquarters
    b. Field Activities
    c. Presentation

CHAPTER V PERSONNEL RELATIONS AND SERVICES

A. ASSOCIATE MANAGEMENT RELATIONS POLICY
    1. Standards of Conduct
    2. Loyalty
B. POLICTICAL ACTIVITY
C. BUSINESS-BASED ACTIONS
D. ASSOCIATE GRIEVANCES
E. DISCIPLINARY ACTIONS
F. ADVANCE NOTICE AND ASSOCIATE REPONSE TIME FRAMES
    1. Grievable Actions
    2. Appealable Actions
G. OFFICIAL RESPONSIBLE FOR EFFECTING DISCIPLINE
H. ADMINISTRATIVE APPEALS PROCEDURE
I. INCENTIVE AWARDS AND RECOGNITION PROGRAMS
J. OCCUPATIONAL SAFETY AND HEALTH
K. DRUG AND ALCOHOL ABUSE
L. LABOR-MANAGEMENT RELATIONS POLICY
M. ENTITLEMENT TO PERSONAL SERVICES AND GOVERNMENT QUARTERS
N. "WHISTLE BLOWER" PROTECTION FOR NAFI ASSOCIATES AND APPLICANTS

APPENDIX V-A TERMINATION OF EMPLOYMENT

1. Separation Codes
2. Termination During Probationary Period
3. Abandonment of Position
4. Termination Interview
5. Return of Property
6. Federal Unemployment Compensation
7. Designation of Beneficiary For Unpaid Compensation

APPENDIX V-B UNSATISFACTORY PERFORMANCE

APPENDIX V-C GUIDE FOR DISCIPLINARY ACTION PENALTIES

1. Offenses and Ranges of Penalties
2. Table of Disciplinary Action Penalties

**D. Associate Grievances.**

a. NAFI associates shall have the right to present their complaints and grievances to management officials for prompt and equitable consideration. The Heads of DoD Components shall establish procedures for deciding grievance of associates in an equitable and timely manner.

b. Where a labor organization has exclusive recognition, any negotiated grievance procedure shall be governed by 5 U.S.C. 7101 et seq., as implemented by DoD Directive 1426.1 and DoD 1400.25-M.

c. The associate grievance procedure may be used to resolve associate disputes of business-based actions and disciplinary actions of suspension of 30 days or less.

**SECNAVINST 5300.22C; V 3-5**

Administrative Grievance Procedure

NAFI associates may present their complaints and grievances to management officials for prompt and equitable consideration.

Heads of NAFI Headquarters Elements will establish administrative procedures for the equitable and timely resolution of associate grievances. These procedures must include:

1/95

A requirement for a timely, written presentation of the grievance, which must specify the relief requested by the grievant.

A right of representation by a person of the associate's own choice subject to the willingness of the chosen person to serve, no conflict of interest or position, and the priority needs of the local NAFI. Any fees charged by the associate's representative are the responsibility of the associate.

Assurance that the associate and representative will be free from restraint, coercion, discrimination, or reprisal stemming from the presentation of the grievance.

A method of reviewing the grievance, which will consist of one or more of the following options:

Personal presentation to the official designated to decide the grievance.

Personal presentation to an agent designated by the deciding official to review the grievance and submit a report of findings and, optionally, recommendations.

A review of the written record by the deciding official.

A final written decision by an authorized official within 90 calendar days of the filing of the grievance. The final written decision will be made by an authorized official not personally involved in the events leading to the grievance, except that this provision does not apply to the Heads of NAFI Headquarters Elements.

Matters excluded from this grievance procedure include:

Any matter, which is subject to final administrative review above, the local installations command level.

The content of published policy.

Non-selection for promotion, except for procedural error.

Termination of a temporary personnel action.

An action terminating a probationary or flexible associate.

Non adoption of a suggestion or disapproval of a cash or honorary award or any award the granting of which is discretionary with management. 1/95

A proposed action, notice of warning or caution, or any other prospective discretionary management action.

Alleged discrimination.

Any action for which another adjudicatory procedure exists.

Failure to receive a pay adjustment or the amount of a pay adjustment under the DoD Pay Banding System.

**NEXCOM**

Grievance procedure exclusions, for clarification purposes, include published NEXCOM regulations; the termination of flexible, temporary and intermittent associates.

A grievance is an associate's expressed feeling of dissatisfaction, usually with aspects of working conditions and relationships which affect him or her as an individual but which are outside of his or her direct control. Matters of grievance also include, but are not restricted to letters of reprimand, use of emergency suspensions without pay pending disciplinary action, and suspensions without pay for 30 calendar days or less. When two or more associates within the same exchange have identical grievances (I.e., the dissatisfaction expressed and the relief requested are the same, exchanges may join and process them as one grievance) Time limits for the filing of grievances are counted in calendar days. Grievances must be filed in writing within ten calendar days of the act or occurrence giving rise to the grievance or from the date that the associate became aware of the act or occurrences and provide a clear statement of the issues and indicate the specific personal relief sought.

Associates have the right to be accompanied, represented and advised by any person of their own choice, subject to no conflict of interest and/or to the willingness of the chosen person to serve in processing a grievance. The employer may disallow the choice of an individual as a representative which would result in a conflict of interest or position or a conflict with the priority needs of the exchange. If a grievant's choice of representative is denied, that decision may be grieved to the next higher level of management for a final, non reviewable decision. Any fees charged by the associate's representative are the responsibility of the associate. Associates and their representatives are entitled to freedom from restraint, interference, coercion, discrimination or reprisal in presenting a grievance as well as a reasonable amount of official time, as determined by the deciding official, to present a grievance. At any step of the grievance procedure, the aggrieved associate may request assistance from the Personnel department. Assistance is limited to the procedural aspects of filing and pursuing a grievance.

All grievances will receive a fair, objective and timely review. As appropriate, and based upon the level of the grievant in the exchange, all levels of supervision may attempt in an informal manner to resolve the grievance. Grievances may be delegated by deciding officials to subordinate managers and supervisors for review and submission of a report of finding or decision to the extent deemed appropriate. However, the subordinate manager or supervisor must be at a higher level in the exchange than the associates involved in any phase of the grievance.

Managers and supervisors at all levels are to immediately contact the NEX personnel department upon receipt of a grievance to seek advice, guidance and necessary assistance on the processing of the grievance. Exchange personnel departments are to contact NEXCEN/NEXCOM HRSC labor relations advisors for grievance assistance and guidance. Issues to discuss may include:

whether to accept, reject, or remand all or part of the grievance and which issues, if any, will be investigated,

whether to allow the grievant's choice of representative, if applicable,

determining a reasonable amount of time to be afforded the grievant and representative to present the grievance and/or

determining the method to resolve the grievance, I.e.: using the facts presented in the written grievance, conducting a fact-finding inquiry, initiating third party fact-finding, resulting in written findings of fact and recommendations.

STEP 1

The aggrieved associate must file the grievance, orally and/or in writing, to the lowest official in the supervisory chain who can grant relief, within ten calendar days of the condition or circumstance, which caused the grievance. This official will consider the grievance and provide the associate an answer within ten calendar days when possible. If the deciding official is unable to answer the grievance within ten calendar days, he or she will advise the associate in writing when they can expect an answer.

STEP 2

If the grievance is not resolved to the satisfaction of the grievant at step 1, the associate shall have seven calendar days from the rendering of the step 1 decision, or expiration of the ten calendar day (or extended) response period, to reduce the grievance to writing, state the exact nature of the grievance, the date that the incident occurred, remedy sought and submit it to the management official next in the chain of command above the individual who considered the grievance at step 1. This individual becomes the final deciding official, This official will review the written record, conduct an investigation (optional), if he or she decides one is required, and issue a final written decision within 90 calendar days following the first filing of the grievance. If a decision hasn't been issued within 90 days, the next level of management will direct a decision within ten calendar days.

1/95

Step 2 decisions are final for all grievances, except when the step 2 official is personally involved in the events giving rise to the grievance. In such cases, the next higher level of management in the chain of command will act as the deciding official. The mere allegation of personal involvement of a deciding official does not suffice to remove the grievance from that level.

Grievances proceed to COMNEXCOM when the step 1 official is the Installation Commander or CONEXCEN.

If an allegation of discrimination because of race, age, sex, color, national origin, religion, handicapping condition or reprisal for prior EEO complaint involvement is raised at any stage of the grievance procedure, the associate will be informed in writing that introduction of the allegation will serve to suspend processing of the matter under the administrative grievance procedure. The grievant must be given the opportunity to withdraw the allegation and continue under the administrative grievance procedure or proceed under the discrimination complaint procedure. The grievant's decision must be documented and made part of the grievance file. The grievant should be notified that failure to select a procedure will be interpreted as a choice to pursue the discrimination complaint procedure, and the grievance will be terminated. If the grievant's written decision is to pursue the matter under the discrimination complaint procedure, the grievant will be notified in writing that the grievance shall be canceled.

Refer to Appendix III-C for Pay Banding Grievance Policy.

**DoD 1401 .1-M; V 7**

**E. Disciplinary Actions**

a. A disciplinary action is a personnel action affecting a regular associate that reduced the associate's basic pay or level; placed the associate in a non pay, non duty status; or separated the associate from NAFI employment and that was effected for cause; I.e., the disciplinary action stemmed directly from the actions of the effected associate.

b. Disciplinary actions do not include:

(1) Business-based actions.

(2) Actions taken as the result of termination of temporary promotion.

(3) Separation or change to lower pay or level when voluntarily initiated by the associate.

(4) Application of a revised prevailing rate schedule when there is no change to the position.

(5) Actions taken as a result of an associate abandoning his or her position.

1/95

c. Procedures for Processing Disciplinary Actions and Appeals. The Heads of DoD Components shall issue regulations and procedures for processing disciplinary actions and for handling associate appeals of disciplinary actions that result in reduction of pay or in separation. That appeals process shall include a final appellate decision above the level of Installation Commander or General Managers of the Army and Air Force Exchange Services.

**SECNAVINST 5300.22C; V 5-6**

Heads of NAFI Headquarters Elements will establish consistent procedures for effecting disciplinary actions against regular associates. These procedures must include:

For letters of reprimand and suspensions for 30 calendar days or less:

Written notice of decision which specifies the reasons for the action.

Opportunity to grieve the action.

For demotions, terminations, and suspensions for more than 30 calendar days:

Not less than 14 calendar days advance written notice specifying the reasons for the proposed action.

Opportunity to reply to the proposed action. The reply must be made to the official who is to decide the action or that official's designee. If an oral reply is permitted, a summary of any oral reply will be made and appended to the official record.

Opportunity to review all evidence relied upon to support the reasons for the proposal.

A right to representation by a person of the associate's own choice, subject to the willingness of the chosen person to serve, no conflict of interest or position, and the priority needs of the NAFI. Any fees charged by the associate's representative are the responsibility of the associate.

Assurance that the associate and representative will be free from restraint, coercion, discrimination, or reprisal.

Written decision of disciplinary action which:

Is delivered to the associate in advance of the effective date of the disciplinary action.

Identifies which reasons were sustained and which were not sustained.

1/95

Explains the rationale for the decision.

Specifies the associate's right of appeal, how such appeal is to be filed, and the time limits for submission of an appeal.

A written decision may not increase the penalty proposed in the advance notice.

An associate may be placed on emergency suspension without pay, pending disciplinary action, when retention of the associate might result in damage to or loss of property or funds, might be injurious to the associate or others, might be detrimental to the interest of the NAFI, or when there are justifiable reasons to believe that the associate is guilty of a crime for which a prison sentence may be imposed. In such cases, the associate will be provided 24 hours' advance notice, in a pay status, of the emergency suspension. If the final disciplinary action taken on an associate so suspended is less than removal, the associate will be paid for the time so suspended, less any loss of pay required by the disciplinary action. An emergency suspension without pay which extends for 31 calendar days or more may be appealed.

**NEXCOM**

Grievances/appeals over emergency suspensions without pay pending disciplinary action will only address the need for or appropriateness of the suspension.

**SECNAVINST 5300.22C; V 6-7**

Heads of NAFI Headquarters Elements may establish guidelines for effecting a range of penalties for disciplinary offenses. Any such guidelines must be applied equitably throughout all local NAFIs under the cognizance of the Headquarters Element.

The standard of proof in deciding disciplinary actions and any grievances or appeals thereof shall be substantial evidence. Substantial evidence is defined as such relevant evidence as a reasonable mind might accept to support a conclusion.

An official record will be established for each disciplinary action effected. This official record will be maintained for a period of at least 2 years from the date of the action. The record will consist of:

The applicant's petition of appeal.

A copy of the notice of proposed disciplinary action.

A copy of the appellant's written response, if any, to the notice of proposed action.

1/95

A summary of the appellant's oral response, if any, to the notice of proposed action.

A copy of the written decision of disciplinary action.

A copy of the official document effecting the disciplinary action.

Any and all evidence relied upon in support of the disciplinary action.

**NEXCOM**

NON-DISCIPLINARY ACTIONS

Admonishment, written or oral.
Letters of caution for work performance or conduct deficiencies.
Emergency Suspension without pay pending disciplinary action.

See Appendix V-B for procedure for processing unsatisfactory work performance actions.

DISCIPLINARY ACTIONS
Letters of reprimand.
Suspension without pay.
Demotion.
Termination for cause.

**F. ADVANCE NOTICE AND ASSOCIATE RESPONSE TIME FRAMES**

GRIEVABLE ACTIONS:

Emergency Suspension without pay pending disciplinary action -- 24 hours advance notice in a pay status. **Letters of reprimand and suspension without pay for 30 calendar days or less – not less than seven calendar days advance notice and five calendar days for associate to respond.

APPEALABLE ACTIONS:

Suspension without pay for 31 calendar days or more, demotion or termination for cause -- not less than 14 calendar days advance notice and ten calendar days for associate to respond.

**1/95**

** Emergency Suspensions without pay pending disciplinary action that exceed 30 calendar days.

## G. OFFICIAL RESPONSIBLE FOR EFFECTING DISCIPLINE

Immediate supervisors - - Up to and including letters of reprimand.

Department managers or equivalent - - Suspension without pay for 30 calendar days or less, failure to qualify during probationary period, termination of temporary, intermittent and flexible associates.

CONEXCEN/NEO/GM/Group Director or equivalent - - Demotions, suspension without pay for 31 calendar days or more, termination for cause.

Activity Commanding Officers may take action when the Navy Exchange Officer is personally involved.

Advance written notices, when required, will include the offense charged, whether it is a first, second, third or subsequent offense, the evidence which supports the charge, the penalty proposed and the number of days after receipt of the advanced notice that the associate has in which to provide an oral and/or written response. Response time limits may be extended upon request.

Management will weigh the associate's reply and ascertain all pertinent facts prior to making a final decision. Due weight will be attached to factors supporting the associate's position, whether or not the associate offers such factors in his or her own defense. Penalties imposed or assigned will be that which is necessary to correct the associate and maintain discipline and morale. Full consideration will be given to associate's replies. When supervisors and management officials are considering severity of penalties, example factors for consideration are as follows:

The nature and seriousness of the offense and its relation to the employee's duties, position and responsibilities, including whether the offense was intentional, technical or inadvertent, was committed maliciously or for gain, or has been frequently repeated;

The associate's job level and position within the organization, including supervisory or fiduciary role;

The associate's past disciplinary record and when the discipline occurred;

The associate's past work record, such as length of service, performance on the job, dependability, character etc.;

The associate's condition of health, extraordinary personal influence, such as death or other crises in his or her family;

The effect of the offense upon the associate's ability to perform at a satisfactory level and its effect upon the supervisor's confidence in the associate's ability to perform assigned duties;

Consistency of the penalty with those imposed upon other associates for the same or similar offenses;

The notoriety of the offense or its impact upon the reputation of the agency;

Potential for the associate's rehabilitation.

NEXCOM guidelines for disciplinary action penalties are contained in the Guide For Disciplinary Action Penalties, Appendix V-C.

If an associate's record of past disciplinary offense is considered in assessing the penalty for a current offense, the associate must be so advised of this fact in the advance notice and notice of decision.

Flexible, temporary or intermittent associates may have disciplinary action taken against them. Such discipline will be effected in writing.

Notice for action less than termination will contain the specific action to be taken, effective date of the action, information stating exchange management's conclusion of his or her conduct, right of reply in writing, within 24 hours and assurance of consideration of reply.

Notice for termination action taken for cause will be written and will contain the effective date, the reason for the action, right of reply within 24 hours and assurance of consideration of reply and a statement that the associate has no right to appeal management's decision. Separation Code 15 is selected on terminating personnel action.

Further guidance on the disciplinary process can be found in Publication No. 60, Effective Employee Relations.

**SECNAVINST 5300.22C; V 8-9**

Appeals of Disciplinary Actions.

The procedure for appealing disciplinary actions will be a two-step process conducted under the cognizance of the Head of the NAFI Headquarters Element.

If an associate alleges that the action resulted from an act of discrimination, the action may be contested through the discrimination complaint procedure.

Heads of NAFI Headquarters Elements will establish procedures for associates to appeal appealable disciplinary actions which will include the following elements:

Establishment of a two-step appeal process with the second decision level for all appeals to be the Head of the NAFI Headquarters Element.

The right to one formal hearing, if the associate requests, to ascertain and consider the facts upon which the disciplinary action was taken and the reasons the associate feels the decision should be reversed. A comprehensive record of the hearing will be maintained, including the recommendation of the hearing officer on the proposed disposition of the appeal, and appended to the official record. The associate shall be given the opportunity to submit evidence and the testimony of witnesses, cross-examine witnesses, and present appropriate affidavits and depositions.

The right of the associate to be represented by an individual of his or her own choosing, subject to the willingness of the chosen person to serve, the priority needs of NAFI, and no conflict of interest or position. Any fees charged by the associate's representative are the responsibility of the associate.

An initial written decision within 60 days of submission of the appeal or within 60 days of completion of the hearing, if a hearing is held. The initial decision will:

Identify which reasons were sustained and which were not sustained.

Explain the rationale for the decision.

Specify the associate's right of appeal to the Head of the NAFI Headquarters Element, the time limits for such an appeal, and how and where such an appeal is to be filed.

The standard of review shall be substantial evidence.

**NEXCOM**

Substantial evidence is defined as such relevant evidence as a reasonable mind might accept to support a conclusion.

**SECNAVINST 5300.22C; V 9**

The decision of the Head of the NAFI Headquarters Element will be issued in writing, explaining the rationale for the decision. This is the final decision on the appeal.

**1/95**
**NEXCOM**

## H. ADMINISTRATIVE APPEALS PROCEDURE

NAVY EXCHANGE

| DETACHMENT | MAIN |
|---|---|
| STEP 2 COMNEXCOM | COMNEXCOM |
| STEP 1 INSTALLATION COMMANDER | INSTALLATION COMMANDER |

NAVY EXCHANGE SERVICE CENTER

STEP 2 COMNEXCOM
STEP 1 CONEXCEN

NAVY EXCHANGE SERVICE COMMAND

STEP 2A* COMNAVSUP
STEP 2 COMNEXCOM
STEP 1 VICE COMMANDER or the Step above the official taking the action.

* APPEALS PROCEED TO THIS LEVEL ONLY WHEN COMNEXCOM EFFECTS THE ADVERSE ACTION

The time frame for filing and elevating appeals as well as requesting a hearing (Step 1 only, as no hearing is held at Step 2) is fifteen calendar days from the notice of decision of disciplinary action, response of the Step 1 official, etc. Step 2 appeals must be submitted via the Step 1 deciding official.

An Administrative Hearing Guide is provided as Appendix V-D.

# EXHIBIT
# 5

LAW OFFICES OF
**LLOYD EDWARD TOOKS**
***Attorney at Law***

*Mailing Address:*
*P.O. Box 153096*
*San Diego, California 92195-3096*

*(619) 264-6895*
*(619) 262-3310 [Fax]*

March 21, 2008

Mr. Tom Jacobsen
General Manager
Navy Exchange
P.O. Box 357045
NAS North Island
San Diego, CA 92135-7045

Subj: TIMOTHY D'ANGELO'S APPEAL OF HIS EMERGENCY SUSPENSION

Ref: (a) Notice of Suspension Without Pay Pending Disciplinary Action, dated 13 February 2008
(b) Navy Exchange Manual, Chapter V, para. E (c)

Dear Mr. Jacobsen:
I have been retained by Mr. Timothy D'Angelo to represent him in the appeal of an indefinite emergency suspension issued to him, first verbally on February 12, 2008, and then in writing the next day. See reference (a) above. By his signature herein below Mr. D'Angelo confirms my representation.

As the emergency suspension has exceeded thirty (30) days, **please accept this letter as Mr. D'Angelo's formal appeal of the suspension, in accordance with reference (b) above, and based on the advice given in reference (a).**

In order to complete my preparation for this appeal, and pursuant to the appeal rights set forth in reference (b), I would appreciate receiving, as soon as possible, the following:

1. A statement of any acts, or possible acts, of alleged misconduct by Mr. D'Angelo upon which his emergency suspension was based.

2. A statement of each reason why it was "determined that [Mr. D'Angelo's] retention might be detrimental to the interests of the Navy Exchange" (reference (a)).

3. A copy of each writing [i.e., letter, memo, affidavit/declaration, e-mail, transcription, rule, regulation, etc.], tape recording, CD, and other tangible object, that you contend support the reasons for Mr. D'Angelo's emergency suspension.

I look forward to receiving this information and material at your earliest convenience.

Yours in closing,

LLOYD EDWARD TOOKS

This will confirm the fact that I have retained attorney Lloyd Edward Tooks to represent me in the appeal of my emergency suspension.

TIMOTHY D'ANGELO

# EXHIBIT
# 6

DEPARTMENT OF THE NAVY
NAVY EXCHANGE
P.O. BOX 357045
NAS NORTH ISLAND
SAN DIEGO, CALIFORNIA 92135-7045

04 APRIL 2008

From: General Manager
To: Mr. Lloyd Edward Tooks, Attorney at Law, P.O. Box 153096, San Diego, CA 92195-3096

Subj: Timothy D'Angelo's Appeal of His Emergency Suspension

Ref: (a) Your Appeal dated March 21, 2008
(b) Navy Exchange Manual, Volume 3, Publication 145, Chapter V

1. This is in reply to reference (a), your appeal on behalf of Mr. Timothy D'Angelo, concerning the Notice of Suspension Without Pay Pending Disciplinary Action, dated 13 February 2008. After careful review of the record, it is my decision to deny your appeal.

2. In accordance with the Navy Exchange Manual, Volume 3, Publication 145, Chapter V, appeals of Emergency Suspensions may only address the appropriateness of the suspension. The Department of Defense has deemed an emergency suspension appropriate when there exists substantial evidence that retention of the employee might be detrimental to the interests of the Navy Exchange System. In an interview with your client conducted on 12 February 2008, he admitted that he had given Local Nationals Navy Exchange Gift Certificates, that he had taken an unauthorized discount when he purchased a coat from the Navy Exchange, accepted gifts from Navy Exchange Vendors, and had made improper special orders of merchandise through the Navy Exchange. These actions were in violation of Navy Exchange policies. This information justified the emergency suspension of your client.

3. In accordance with reference (b), you may appeal this decision to Commander, Navy Exchange Service Command, 3280 Virginia Beach, VA 23452-5724, within 15 calendar days of receipt of this letter.

Signature

DEDICATED TO
OUTSTANDING CUSTOMER SERVICE
AND EXCELLENT VALUE

# EXHIBIT
# 7

LAW OFFICES OF
**LLOYD EDWARD TOOKS**
*Attorney at Law*

*Mailing Address:*
*P.O. Box 153096*
*San Diego, California 92195-3096*

*(619) 264-6895*
*(619) 262-3310 [Fax]*

April 8, 2008

**ALSO SENT VIA FACSIMILE [(619) 522-7453] ON 04/08/08**

Mr. Tom Jacobsen
General Manager, Navy Exchange
P.O. Box 357045
NAS North Island
San Diego, CA 92135-7045

Re: Timothy D'Angelo's Appeal Of His Emergency Suspension

Dear Mr. Jacobsen:

Yesterday, April 7, I received your April 4 memorandum response to my March 21 letter on behalf of my client Mr. Timothy D'Angelo. Your response to Mr. D'Angelo's appeal is, "[a]fter careful review of the record, it is my decision to deny your appeal." However, I am unaware of any provision in the "Navy Exchange Manual, Volume 3, Publication 145, Chapter V," that grants the Exchange the right to "deny" an appeal. It is my understanding that Chapter V of the Manual grants Mr. D'Angelo the right to appeal an emergency suspension which extends for 31 calendar days or more. It is also my understanding that, among other things, Mr. D'Angelo has the right (i) to know both the acts he is alleged to have committed and the law he is alleged to have violated, (ii) to review all the evidence relied on to support his suspension, and (iii) to respond to such evidence, and have his response considered, all prior to any determination being made as to the appropriateness of the suspension.

Tom Jacobsen
D'Angelo appeal
page 2

If my understanding of Mr. D'Angelo's rights is in error please provide me with a copy of the provisions of Chapter V that set forth each step of the appeal process, including but not limited to any provision that grants the Navy Exchange the right to "deny" an appeal. And, as time is of the essence, I would appreciate it if you would send me your response, via facsimile to the number set forth in the letterhead of this letter, by Monday, April 14, 2008.

Thanking you for your anticipated cooperation, I remain

Yours in closing,

LLOYD EDWARD TOOKS

cc: Timothy D'Angelo

LET:rwt

# EXHIBIT 8

DEPARTMENT OF THE NAVY
NAVY EXCHANGE
P.O. BOX 357045
NAS NORTH ISLAND
SAN DIEGO, CALIFORNIA 92135-7045

DATE: 23 May 2008

Regular Mail – Certificate of Mailing

From: General Manager
To: Mr. Timothy D'Angelo, 3118 Canon Street #2, San Diego, CA 92106

Subj: 14-CALENDAR DAY ADVANCE NOTICE OF PROPOSED DISCIPLINARY ACTION

Ref: (a) Navy Exchange Manual, Vol 3, Pub, 145, Chapter V
(b) Interview Conducted by Dave Imrie on 12 February 2008
(c) NAVSUPPACT La Maddalena Instruction 4065.2E
(d) Statement of Linda Larrabee dated 11 December 2007
(e) Statement by Gary Shirley dated 2 April 2008
(f) Statement by Eugenio Gialanella
(g) 5 CFR 2635.202(a)
(h) Special Orders Instruction Revised 5 May 2003

1. In accordance with reference (a), this is to notify you that it is proposed to terminate your employment no earlier than 14 calendar days from the date you receive this notice.

2. You are charged with a first offense of giving Navy Exchange (NEX) Gift Cards to Local Nationals; a first offense of taking an unauthorized discount of NEX merchandise; a first offense of accepting gratuities from vendors; and, a first offense of special ordering merchandise for your own purchase. The following evidence supports the charges:

Giving Navy Exchange Gift Cards to Local National

a. You refused to make a written statement on 12 February 2008, after an interview conducted by Mr. Dave Imrie, Director, Loss Prevention/Safety (CONUS), reference (b). However, you admitted that you gave NEX Gift Cards to Local Nationals. This was in violation of reference (c).

b. In reference (d), Ms. Linda Larrabee, General Manager, reported that she observed you give NEX Gift Cards to Local Nationals.

c. In the interview with Mr. Imrie, reference (b), you stated that you believed that Mr. Gary Shirley, European District Manager, had authorized you to give gift cards to Local National. In reference (e), Mr. Shirley stated that, "I have never authorized the awarding of NEX gift certificates to any local national (LN) associates in any European Navy Exchanges. Allowing LNs to shop in Navy Exchanges is contrary to the Status of Forces agreements in all countries where European Navy Exchanges are located and was never authorized by me during my tenure as District Manager." In reference (f), Mr.

Eugenio Gialanella, Financial Manager, stated that he told you in January 2005, that you were not authorized to give NEX gift certificates to Local Nationals.

Taking an Unauthorized Discount

c. In reference (b), you admitted that you purchased leather jackets at the NEX at a price point of $10.00, a price significantly under the regular retail-selling price.

Accepting Gifts from Vendors

d. In reference (b), you admitted that you received numerous bottles of wine from local vendors, including Banfi. Accepting gratuities from vendors is a violation of reference (g).

Making Unauthorized Special Orders

e. In reference (b), you acknowledged that on numerous occasions you special ordered cases of wine, locked them in a locked area of the warehouse, and then later you purchased them yourself a few bottles at a time.

f. In reference (d), Ms. Larrabee stated that she discovered cases of wine in the high value cage on the back dock of the NEX. When she inquired about the wine, she was told that you ordered the wine. She went on to state that you admitted that you had ordered the wine and would pay for it before you packed out. When she discovered that the wine was gone, she searched the records to see if you had purchased the wine, and could find no record of the sale.

g. Reference (h) does not authorize the special order of wine.

3. You may respond to this notice orally and/or in writing to the undersigned within ten calendar days from receipt of this notice. Any response will be given due consideration. A written decision will be issued as soon as possible after receipt of your reply, or after expiration of the ten-calendar day limit, if you do not answer.

4. You have a right to representation by a person of your own choosing, subject to the willingness of the person to serve, provided there is no conflict of interest or position, and considering the priority needs of this activity. Any fees charged by your representative are your responsibility. You have a right to review the evidence that was relied upon to support this proposal.

THOMAS P. JACOBSEN

# EXHIBIT
# 9

**LLOYD EDWARD TOOKS**
**Attorney at Law**
**P.O. Box 153096**
**San Diego, California 92195-3096**
**(619) 264-6895**
**(619) 262-3310 [Facsimile]**

# MEMORANDUM

Sent via e-mail as well as facsimile JUNE 2, 2008

From: Lloyd Edward Tooks, Esq, on behalf of Timothy D'Angelo
To: Thomas P. Jacobsen

Subj: Written Response To Notice of Proposed Termination

Ref: (a) Declaration of Timothy E. D'Angelo
(b) Declaration of Marian Ledesma-D'Angelo
(c) 5 CFR §2635.204(a)

I represent Mr. Timothy D'Angelo. This memorandum, and the declarations of Mr. D'Angelo and Marian Ledesma-D'Angelo, are submitted as a written response to the 23 May 2008 Notice of Proposed Disciplinary Action that proposes the termination of Mr. D'Angelo's employment (hereinafter "Notice").

**A. Mr. D'Angelo Has Been Denied The Right To Review Evidence.**

At the outset we state that Mr. D'Angelo cannot be terminated at this time based on the Notice because, contrary to the last sentence of the Notice, Mr. D'Angelo has not been given the right "to review the evidence that was relied upon to support this proposal." Mr. D'Angelo submitted an e-mail request to you on May 26, 2008, stating, "[p]er the last sentence in your Notice of Proposed Disciplinary Action, my attorney Lloyd Tooks and I request the opportunity to review the evidence relied upon to support the proposal, including but not necessarily limited to References (b) through (h) in the Notice." To date neither Mr. D'Angelo nor I have received any such evidence, or any other response to his e-mail.

The failure and refusal to permit Mr. D'Angelo to review the evidence in question, and include in his response to the Notice a response to that evidence, violates Chapter V of the Navy Exchange Manual, specifically the provision granting an employee the "[o]pportunity to review all evidence relied upon to support the reasons for the proposal" (paragraph E c.). The failure and refusal also violates SECNAVINST 5300.22C, and specifically paragraph 7 b. (3) which, again, grants an employee the "[o]pportunity to review all evidence relied upon to support the reasons for the proposal."

**B. Specific Responses To Alleged Offenses.**

1. Giving Navy Exchange Gift Cards To Local Nationals.

As he states in his declaration, submitted herewith, Mr. D'Angelo "authorized the presentation of Gift Certificates to selected associates, including US and Local Nationals, as recognition for performance; based on nomination by management staff" (Timothy D'Angelo Declaration, para. 3). As he further states, "I believed, until sometime after my 12 February 2008 interview, that I was authorizing this practice with the full knowledge and approval of my immediate superior. I now understand that my superior denies giving me any such approval" (*Id*).

It is not alleged in the Notice, and it is otherwise undisputed, that Mr. D'Angelo received no personal benefit or consideration, monetary or otherwise, from the awarding of Gift Certificates to Local National associates for performance recognition.

Moreover, the statements of Gary Shirley and Eugenio Gialanella cannot be relied upon to support Mr. D'Angelo's termination at this time because he has not been given the opportunity to review them and respond to them.

2. Taking An Unauthorized Discount.

The Notice alleges that Mr. D'Angelo "admitted that [he] purchased leather jackets at the NEX at a price point of $10.00, a price significantly under the regular retail-selling price" (Notice, para. c). However, Mr. D'Angelo never made such an admission. And, as confirmed in his declaration and the declaration of his wife submitted herewith, he rejected the vendor's attempt to discount the leather jacket that he purchased, and paid the full price of $140.00 for the jacket. The $140 receipt is attached to Ms Ledesma-D'Angelo's Declaration.

3. Accepting Gifts From Vendors.

The Notice alleges that Mr. D'Angelo "admitted that [he] received numerous bottles of wine from local vendors, including Banfi" (Notice, para. d). Again, Mr. D'Angelo never made such an admission. The facts are as stated in Mr. D'Angelo's Declaration submitted herewith. First, Mr. D'Angelo never personally received a bottle of Banfi wine as a gift, and no bottle of Banfi wine was ever left in his store as a gift. Second, Mr. D'Angelo never personally received a bottle of any other wine as a gift. Third, while occasionally a bottle of wine [but not Banfi] was left in his store as a gift, "[a]ll the wine left in the store by vendors was used as door prizes for customers" (Timothy D'Angelo Declaration, para. 5). Mr. D'Angelo "never consumed any of the wine, removed it from the store, or in any other manner personally used it" (*Id*). Moreover, to Mr. D'Angelo's knowledge, the wine fell within the gift exception set forth in 5 CFR §2635.204(a).

It is my understanding that it is not uncommon for vendors to leave free samples of their products in Navy Exchange stores – here in the US [including the North Island store] and abroad – to be given to customers in connection with promotions.

4. Making Unauthorized Special Orders.

The Notice alleges that Mr. D'Angelo "acknowledged that on numerous occasions [he] special ordered cases of wine, locked them in a locked area of the warehouse, and then later [he] purchased them [himself] a few bottles at a time" (Notice, para. e). Mr. D'Angelo made no such acknowledgment. Again, the facts are as stated in his declaration. See Timothy D'Angelo Declaration, para. 6. Moreover, neither the Special Orders Instruction Revised 5 May 2003, nor Linda Larrabee's statement, can be relied upon to support Mr. D'Angelo's termination at this time because he has not been given the opportunity to review them and respond to them.

LLOYD EDWARD TOOKS
Attorney for Timothy D'Angelo

# DECLARATION OF TIMOTHY E. D'ANGELO

I, TIMOTHY E. D'ANGELO, declare:

1. I am presently employed with the Navy Exchange, and I have been so employed since 1999.

2. From the fall of 2003 to September 2006 I was the General Manager of the Navy Exchange Store in La Maddalena, Italy.

3. Regarding the first charge on which my proposed removal is based -- giving Navy Exchange Gift Cards to Local Nationals -- As the General Manager of the Nexmart in La Maddalena, I authorized the presentation of Gift Certificates to selected associates, including US and Local Nationals, as recognition for performance; based on nomination by management staff. This procedure for recognition was commonplace, and in practice prior to, during, and to my knowledge following my assignment as General Manager at the Nexmart in La Maddalena. I believed, until sometime after my 12 February 2008 interview, that I was authorizing this practice with the full knowledge and approval of my immediate superior. I now understand that my superior denies giving me any such approval.

4. Regarding the second charge on which my proposed removal is based – taking an Unauthorized Discount on a leather jacket -- I selected for purchase, a men's leather jacket, from an in-store consignment vendor (Miele Leather) and paid $140. After selection, but prior to purchase, the vendor proceeded to the frontline register #1 and placed the jacket on the counter, proceeded to write up his receipt and presented it to the associate at the register. The associate rang the transaction up, prior to my arrival to the register. I was informed by the associate that the total was $10. I requested that the associate void the transaction and re-ring the purchase at the correct price, which she did. The attached receipt for $140 represents the purchase price paid for the jacket.

5. Regarding the third charge – accepting bottles of wine as gifts from vendors – Wine vendors did, on occasion leave a gift of wine in the store. These bottles were commonly left in various locations throughout the store, including the Associate Lunch Room, the office area, the Customer Service Counter, or at the frontline registers. It was not uncommon for these bottles to be left without any information regarding who left them. In <u>all</u> instances when bottles of wine were left in this manner, they were turned over to the Cash Office where they were stored and then used as customer door prizes during store events. All of the wine, to my knowledge, fell within the "gift" exception set forth in 5CFR 2635.204(a). All of the wine left in the store by vendors, was used as door prizes for customers. I never consumed any of the wine, removed it from the store, or in any other manner personally used it. I never personally received from a vendor a gift of Banfi wine, and no Banfi wine was ever left in the store as a "gift". I never personally received any bottle of wine as a gift, and whenever a vendor attempted to give me such a gift, I declined to accept it.

6. Regarding the fourth charge -- making unauthorized special orders -- As a customer of the NEX I did request that wine be special ordered. It was common in the European District, to special order wine as part of the "Uniquely European" special order program. In every case, I followed the same protocols and procedure: I placed my order at the Customer Service counter and when notified, I purchased and took delivery of my special orders complete, and in a timely fashion. I never partially purchase a special order. Any suggestion that I special ordered wine and took delivery without paying for it is unequivocally not true. See attached receipt, in the sum of $566.40 for my last purchase of special order wine. Other in the region, including but not limited to Gary Shirley (District Manager Europe) and John Royal (General Manager, Navy Exchange Naples), also special ordered wine. On at least one occasion, Gary Shirley emailed me concerning a wine that he had enjoyed at a restaurant in La Maddalena; and requested that I place a special order on his behalf. I did so.

I declare, under penalty of perjury, that the foregoing is true and correct.

Executed this 1st day of June, 2008 at San Diego, California.

**DECLARATION OF MARIAN LEDESMA-D'ANGELO**

**I, MARIAN LEDESMA-D'ANGELO , declare:**

1. I am Timothy E. D'Angelo's wife, and I was with Tim in La Maddalena, Italy throughout his tenure as the General Manager of the Navy Exchange store in that city.

2. To my knowledge Tim only purchased one leather jacket from the Navy Exchange during our time in La Maddalena, Italy, and I was present when that purchase was made. I was in the Navy Exchange store when Tim selected a leather jacket for purchase. The vendor was also present in the store. After Tim selected the jacket, the vendor took the jacket to the register, and Tim went elsewhere in the store. I was at the register when the vendor brought the jacket to the cashier. The vendor said something to the cashier in Italian, and the cashier rang the jacket up at $10. I called Tim over to the register, and when he discovered that the jacket had been rung up at $10 he said he could not accept that, and that he must pay the full retail price. The jacket was then re-rung at the correct ticketed retail price of $140. I paid the $140 sum for the jacket and a copy of the receipt is attached.

I declare, under penalty of perjury, that the foregoing is true and correct.

Executed this 1st day of June, 2008 at San Diego, California.

Marian Ledesma D'Angelo

# EXHIBIT 10

LAW OFFICES OF
**LLOYD EDWARD TOOKS**
*Attorney at Law*

*Mailing Address:*
*P.O. Box 153096*
*San Diego, California 92195-3096*

*(619) 264-6895*
*(619) 262-3310 [Fax]*

June 9, 2008

**SENT VIA FACSIMILE [619-522-7279]**

From: Lloyd Edward Tooks, Esq., on behalf of Timothy D'Angelo
To: Thomas P. Jacobsen

Subj: Supplemental Written Response To Notice of Proposed Termination

Ref: Supplemental Declaration of Timothy D'Angelo

On the morning of June 2, 2008, a memorandum and two declarations were submitted to you as Mr. Timothy D'Angelo's written response to your proposal to terminate his employment with the Navy Exchange. At the time of that submission Mr. D'Angelo had not received the documents that purportedly support the termination proposal. However, soon after the submission Mr. D'Angelo did receive the documents. This memorandum, and Mr. D'Angelo's supplemental declaration submitted herewith, address relevant matters raised in those documents, and supplement his written response to the termination proposal.

A. Gift Certificates To Local National Associates.
With respect to the charged offense of giving gift certificates to Local National associates in La Maddalena, three facts must be noted at the outset. One, Mr. D'Angelo has never denied that he authorized the giving of certificates to Local National associates in recognition of performance. Two, the certificates were awarded to the Local National associates in open ceremonies or presentations witnessed by Commanding Officers and/or Executive Officers and/or public affairs officers and/or Navy Exchange officials such as Gary Shirley [District Manager for the European District] and Eugenio Gialanella [Financial Manager, European District]. Mr. Gialanella confirms in his statement that he witnessed such an open presentation. Three, there is no evidence that Mr. D'Angelo ever gave gift certificates to Local National associates for any reason other than performance recognition, or that he participated in any "scam" regarding gift certificates. These three facts provide substantial evidence that, even if the giving of gift certificates to Local

National associates violated a written instruction regarding authorized patrons of Navy Exchange stores, Mr. D'Angelo sincerely believed that he had been authorized to do so. The three facts also provide substantial evidence that, if the giving of gift certificates to Local National associates warranted the termination of Mr. D'Angelo's employment, he would have been terminated in 2003, or 2004, or 2005, or 2006, during which time the certificates were openly being given.

Linda Larrabee admits that she authorized the giving of gift certificates to Local National associates. In her statement she says she "submitted a list of gift cards awarded to both United States and *Italian Local National associates* along with the dollar amount to Larry Nicholason to determine actual transactions made on the gift cards." In an apparent effort to defend her violation of the written instruction prohibiting giving gift certificates to Local Nationals, Ms Larrabee alleges that she "was following the rules based on practices that Tim D'Angelo had set as a General Manager. However, if violating the written instruction justifies or mandates disciplinary action, and Ms Larrabee has not suffered any disciplinary action, the termination of Mr. D'Angelo would, among other things, constitute sex discrimination. Also, if a belief that, under a particular circumstance, the giving of gift certificates to Local National associates was authorized, Mr. D'Angelo's actions in that regard should be excused as were Ms Larrabee's.

B. <u>Alleged Leather Jacket Purchases.</u>
Regarding the alleged offense that Mr. D'Angelo purchased leather jackets at a $10 price significantly under the regular retail-selling price, Mr. D'Angelo has denied this in both his original and supplemental declarations. He has even provided the $140 receipt for the only leather jacket he purchased from the NEX store. It should also be noted that the original source of this alleged offense is an alleged confidential witness. Since, pursuant to the Navy Exchange Manual and SECNAVINST 5300.22C, Mr. D'Angelo is entitled to review *all* the evidence relied upon to support the reasons for his proposed removal, he is entitled to know the identity of the witness making this allegation against him. Among other things, he may have information that substantially attacks this witnesses' credibility. And denying him the witnesses' identity denies him the opportunity to benefit from any such credibility evidence.

Apparently in an effort to manufacture additional support for this alleged offense, David Imrie alleges the Mr. D'Angelo admitted that he purchased leather jackets at a price of $10. Suffice it to say that Mr. D'Angelo has not only denied the offense but also denied admitting the offense.

C. <u>Gifts Of Wine From Vendors.</u>
Regarding the alleged offense of accepting gifts of wine from vendors, Mr. D'Angelo has admitted that such gifts – but never any Banfi wine – were left in the Navy Exchange store. He has also made the following *undisputed* statements: (1) he never personally used or consumed any such gift, (2) he never personally removed any such gift from the

store, and (3) such gifts were used as customer door prizes during store events. It must also be noted that 5 CFR §2635.204(a) permits the acceptance of gifts under a certain monetary value. The offense with which Mr. D'Angelo is charged is not supported by any evidence that any gifts of wine received from vendors exceeded the monetary value set forth in §2635.204(a).

D. Unauthorized Special Orders.
Regarding the alleged unauthorized special ordering of wine, in his initial declaration Mr. D'Angelo (1) admitted that he special ordered wine, (2) noted that others, including Gary Shirley, did the same, and (3) noted that he paid, in a timely manner, for all wine he special ordered. In his supplemental declaration Mr. D'Angelo notes that the special ordering of wine was permitted pursuant to the "European Special Order Program."

## CONCLUSION

In his response to the proposal to terminate his employment Mr. D'Angelo does not, in any way, seek to minimize the importance of obeying applicable written regulations. However, regarding the written prohibition against giving gift certificates to Local Nationals, Mr. D'Angelo should not suffer the ultimate punishment of removal for acting contrary to that prohibition for five reasons. One, he acted with the understanding that giving gift certificates, in recognition of performance, to Local National associates was authorized or approved notwithstanding the written prohibition. Dispositive evidence of his understanding in this regard is found in the fact that the gift certificates were awarded in open ceremonies or presentations. He acted openly, not secretly. And people who *knowingly* violate the law don't do that. Two, the military and/or Navy Exchange officials who usually witnessed the ceremonies and presentations knew that gift certificates were being awarded to Local National associates but initiated no disciplinary or corrective action against Mr. D'Angelo. Three, Mr. D'Angelo received no personal benefit, monetary or otherwise, from the awarding of the gift certificates. Four, there is evidence that others, such as Linda Larrabee, also authorized giving gift certificates to Local Nationals and did not suffer any discipline. Five, this is a first offense.

Regarding the alleged purchase of leather jackets for $10, Mr. D'Angelo did not do it. And there is substantial evidence to support his denial of this alleged offense.

Regarding the offense of accepting gifts of wine from vendors, there is no evidence that any such gifts did not fall within the monetary exception in 5 CFR §2635.204(a). Also, it is not an uncommon practice to permit vendors to leave free products in NEX stores to be used during special events. Moreover, even if the wine's value exceeded the monetary exception in §2635.204(a), since the wine was not given to Mr. D'Angelo personally, and was not taken by him for his personal use, the ultimate punishment of removal would not be justified for such a first offense.

Finally, regarding the alleged offense of special ordering wine, Mr. D'Angelo timely paid for the wine he special ordered, and such special orders were permitted under the "European Special Order Program." Moreover, even if the special ordering of wine had been violative of an applicable written regulation Mr. D'Angelo should not be terminated for it because others, including his superior Gary Shirley, did the same. If Ms Larrabee can avoid punishment, for authorizing gift certificates to Local Nationals, with the allegation that she was just following the practice of Mr. D'Angelo, Mr. D'Angelo should be able to avoid punishment for special ordering wine based on the fact that he was just following the practice of people like Mr. Shirley.

LLOYD EDWARD TOOKS

**SUPPLEMENTAL DECLARATION OF TIMOTHY E. D'ANGELO**

**I, TIMOTHY E. D'ANGELO, declare:**

1. I am submitting this additional declaration in response to the proposal that my employment be terminated, because at the time I prepared and submitted my prior declaration I had not received the documents on which the proposal was based. Having now receive and reviewed those documents, I further state the following.

2. Contained in the statements of individuals included in the documents offered as support for the proposal to terminate my employment are suggestions or allegations that I engaged in theft or other criminal conduct while at La Maddalena. For instance, in David Imrie's statement he says that I was aware that the shrinkage at La Maddalena was "atrocious and horrendous", that I was aware that thefts were occurring but was unable to stop them, and that I could not recall the specific date or NCIS representative to whom I had reported my concerns. Also, Linda Larrabee states that she discovered 4-6 cases of wine in the high value cage that I told her I had special ordered. She further states that after the wine was gone, she could not find documentation confirming that I had paid for it. Although such suggestions and allegations of wrongdoing are made, my proposed removal is not based on them. For that reason, I will limit this supplemental statement to those portions of the supporting documents that address the four specific offenses with which I have been charged. I will state for the record, however, that while employed in La Maddalena I did not engage in any theft, or knowingly permit any theft or other inappropriate loss or shrinkage. I paid, in a timely manner, for all products that I acquired for my personal use or consumption.

3. Regarding gift cards given to Local Nationals, I do not deny that it occurred. However, even Ms. Larrabee's statement supports my statement that the gift cards were given to Local Nationals only in recognition of performance, and not for any other reason or purpose. Ms. Larrabee states, "[a]t no time were gift cards ever authorized to be given to Local National associates for any other reason than award recognition." Moreover, Ms. Larrabee even admits that she gave gift cards to Local Nationals. As she states, "a Pre-Thanksgiving Award Ceremony was held in the Navy Exchange main store [and] I submitted a list of gift cards awarded to both United States and Italian Local National Associates along with the dollar amount to Larry Nicholason to determine actual transactions made on the gift cards." To my knowledge Ms. Larrabee has suffered no disciplinary action for this. It would appear, therefore, that I [a male] am being treated differently than Ms. Larrabee [a female]. Also, Mr. Shirley states that he has never authorized the awarding of gift cards to Local Nationals. However, with respect to his communications with me directly, he states "I *do not recall* Mr. D'Angelo ever specifically asking me if he could award NEX gift certificates to his LN associates". Mr. Shirley also states, "nor *do I recall* him ever specifically asking me if he could award cash awards to his LN associates."

4. Regarding the leather jacket purchase, the Confidential Witness alleges that my purchase of two jackets, at $10 each, was made during the 2005 Christmas Season. I reiterate, however, that I paid the full retail price of $140 for one leather jacket I purchased from the store, and that purchase was made *in March 2005*. See receipt attached to Marian Ledesma-D'Angelo's statement. I did not purchase any leather jacket from the store during the 2005 Christmas Season. In fact, from December 1 to December 17, 2005, I was on home-leave in the United States. Also, I never admitted to David Imrie, or anyone else, that I purchased leather jackets at a price of $10.

5. Regarding accepting bottles of wine as gifts from vendors, the only reference that I found in the supporting documents to that alleged offense is the statement of David Imrie that I "acknowledged" receiving numerous bottles of wine as gifts from Local Vendors. This is not accurate, and I stand by my initial statement regarding this matter. See my initial declaration, dated June 1, 2008, paragraph 5.

6. Regarding making unauthorized special orders of wine, again I stand by my initial declaration. In addition, to the extent that the alleged offense is based on a contention that I special ordered an item – wine – that was not subject to special order, I dispute the contention. While the documents offered as support from my proposed termination include a special order instruction, there was also a "European Special Order Program" in place that permitted the special order of products that included wine. And, again, I timely paid for any and all wine that I special ordered for myself.

I declare, under penalty of perjury, that the foregoing is true and correct.

Executed this 7th day of June, 2008 at San Diego, California.

# EXHIBIT
# 11

**DEPARTMENT OF THE NAVY**
Navy Exchange, North Island Complex
NAS North Island, Bldg. 2017
P.O. Box 357045
San Diego, California 92135

GM:TJ:ej
1 July 08

CERTIFIED MAIL – Return Receipt

From: General Manager
To: Mr. Timothy D'Angelo, 3118 Canon Street #2, San Diego, CA 92106
Via: Mr. Lloyd Edward Tooks, Esq., P.O. Box 153096, San Diego, CA 92195-3096

Subj: NOTICE OF DECISION OF DISCIPLINARY ACTION

Ref: (a) 14-Calendar Day Advance Notice of Proposed Disciplinary Action dated 23 May 2008
(b) Navy Exchange Manual, Vol 3, Pub, 145, Chapter V
(c) Interview Conducted by Dave Imrie on 12 February 2008
(d) NAVSUPPACT La Maddalena Instruction 4065.2E
(e) Statement of Linda Larrabee dated 11 December 2007
(f) Statement by Gary Shirley dated 2 April 2008
(g) Statement by Eugenio Gialanella dated 13 March 2008
(h) 5 CFR 2635.202(a)
(i) Special Orders Instruction Revised 5 May 2003
(j) Memorandum from Lloyd Edward Tooks, Esp, on behalf of Timothy D'Angelo dated June 2, 2008
(k) Your Declaration dated 1 June 2008
(l) Supplemental Written Response to Notice of Proposed Termination dated June 9, 2008, Submitted by Lloyd Edward Tooks
(m) You Supplemental Declaration dated 7 June 2008

1. Reference (a) gave you advance notice of proposed disciplinary action, the reason for it, and provided you with the opportunity to reply to the charge.

2. You are hereby notified of my decision to terminate you effective 6 July 2008. This action is taken in accordance with reference (b).

3. You are charged with a first offense of giving Navy Exchange (NEX) Gift Cards to Local Nationals; a first offense of taking an unauthorized discount of NEX merchandise; a first offense of accepting gratuities from vendors; and, a first offense of special ordering merchandise for you own purchase. The following evidence supports the charges:

Subj: NOTICE OF DECISION OF DISCIPLINARY ACTION

Giving Navy Exchange Gift Cards to Local National

a. You refused to make a written statement on 12 February 2008, after an interview conducted by Mr. Dave Imrie, Director, Loss Prevention/Safety (CONUS), reference (c). However, you admitted that you gave NEX Gift Cards to Local Nationals. This was in violation of reference (d).

b. In reference (e), Ms. Linda Larrabee, General Manager, reported that she observed you give NEX Gift Cards to Local Nationals.

c. In the interview with Mr. Imrie, reference (c), you stated that you believed that Mr. Gary Shirley, European District Manager, had authorized you to give gift cards to Local Nationals. In reference (f), Mr. Shirley stated that, "I have never authorized the awarding of NEX gift certificates to any local national (LN) associates in any European Navy Exchanges. Allowing LNs to shop in Navy Exchanges is contrary to the Status of Forces agreements in all countries where European Navy Exchanges are located and was never authorized by me during my tenure as District Manager." In reference (g), Mr. Eugenio Gialanella, Financial Manager, stated that he told you in January 2005, that you were not authorized to give NEX gift certificates to Local Nationals.

Taking an Unauthorized Discount

c. In reference (c), you admitted that you purchased leather jackets at the NEX at a price point of $10.00, a price significantly under the regular retail selling price.

Accepting Gifts from Vendors

d. In reference (c), you admitted that you received numerous bottles of wine from local vendors, including Banfi. Accepting gratuities from vendors is a violation of reference (h).

Making Unauthorized Special Orders

e. In reference (c), you acknowledged that on numerous occasions you special ordered cases of wine, locked them in a locked area of the warehouse, and then later you purchased them yourself a few bottles at a time.

f. In reference (e), Ms. Larrabee stated that she discovered cases of wine in the high value cage on the back dock of the NEX. When she inquired about the wine, she was told that you ordered the wine. She went on to state that you admitted that you had ordered the wine and would pay for it before you packed out. When she discovered that the wine was gone, she searched the records to see if you had purchased the wine, and could find no record of the sale.

g. Reference (i) does not authorize the special order of wine.

4. In references (j) and (l ), Mr. Tooks replied to the advance notice, and you replied in references (k) and (m), and these replies have been carefully considered. However, they did not provide additional information that would warrant the imposition of a lesser penalty; nor have any other factors supporting your position come to light. Rather, for the reasons stated below, the record continues to support the disciplinary action being taken.

a. In reference (j), Mr. Tooks states that you cannot be terminated because you had not been given the opportunity to review the evidence used to support your proposed termination.

Answer: Reference (l) acknowledged that the evidence requested has been provided.

b. In reference (j), Mr. Tooks stated that you denied knowledge that you were not supposed to give gift certificates to Local Nationals and believed that the practice was done with the full knowledge and approval of your immediate superior. Mr. Tooks went on to say that the statement in references (f) and (g) could not be relied upon because you had not been given the opportunity to review and respond to them.

Answer: Mr. Gialanella stated in reference (g), that in January 2005, he told you not to give NEX gift cards to Local Nationals because they were not authorized to shop at the NEX. Reference (l), acknowledged that the evidence requested has been provided.

c. In reference (j), Mr. Tooks stated that you denied that you admitted purchasing a leather jacket significantly under the retail price. Mr. Tooks also enclosed a receipt dated 3/12/05, for $140.00, which was claimed to be for a leather jacket.

Answer: The receipt dated 3/12/05 does not indicate it was for a leather jacket. Your subsequent denial of the admission you made to Mr. Imrie does not persuade me that you did not make the admission.

d. In reference (j), Mr. Tooks stated that you denied that you admitted taking several bottles of wine from local vendors. He stated that you said any wine left at the store was not a gift to you. Finally, he stated that to your knowledge the gifts fell within the exception of 5 CFR 2635.204(a).

Answer: Your subsequent denial of the admission you made to Mr. Imrie does not persuade me that you did not make the admission. There are limitations on the use of exceptions when the frequency of gifts from the same or different sources are so frequent that a reasonable person would believe that the person is using his position for private gain. There is no indication that vendors provided all NEX employees with the same consideration that was provided to you, the General Manager.

In reference (j), Mr. Tooks stated that you denied that you admitted that on numerous occasions you special ordered wine and locked it in the warehouse and purchased them later a few



DEDICATED TO
OUTSTANDING CUSTOMER SERVICE
AND EXCELLENT VALUE

bottles at a time. He also alleged that the statement of Ms. Larrabee could not be relied on because you were not provided a copy of the statement.

Answer: Your subsequent denial of the admission you made to Mr. Imrie does not persuade me that you did not make the admission. Reference (l) acknowledges that the evidence requested has been provided.

f. In reference (k) you denied making the statements attributed to you by Mr. Imrie.

Answer: Your subsequent denial of the admissions you made to Mr. Imrie does not persuade me that you did not make the admissions.

g. In reference (m), Mr. Tooks stated you acknowledged that you gave Local Nationals gift certificates for use at the NEX, but that you thought you were authorized to do it. In support of your belief, he noted that you gave the awards at public ceremonies and cited reference (g) to show that Mr. Gialanella observed such a ceremony.

Answer: In reference (g), Mr. Gialanella's stated that when he observed you giving gift certificates to Local Nationals he told you not to issue gift certificates to Local National since they were not authorized to shop at the NEX. Given Mr. Gialanella's statement, I cannot accept your statement that you did not know the issuing of gift certificates to Local Nationals was prohibited until after February 12, 2008.

h. In reference (m), Mr. Tooks noted that Ms. Larrabee also admitted that she had given gift certificates to Local Nationals and she had received no discipline for this action. It was alleged that it was sex discrimination to discipline you and not to discipline her.

Answer: There is no indication that your act and hers were the same. You were told not to do it and did it anyway. She was following your lead. In reference (e), Ms. Larrabee stated that, "Tim D'Angelo said that giving gift cards to local nationals was approved by former District Manager Gary Shirley and Eugenio Gialanella, Navy Exchange Financial Manager as well as the Base Commander and Executive Officer."

i. In reference (m), Mr. Tooks alleged that the failure to provide the identity of a confidential witness denied you the right to all the evidence relied on to support the proposed termination. He went on to state that you denied making the admission that you purchased jackets at a price of $10.00

Answer: The evidence relied on to support the charge of purchasing jackets for $10.00 was based on your admission, not the statement of a confidential witness. Your subsequent denial of the admissions you made to Mr. Imrie does not persuade me that you did not make the admissions.



DEDICATED TO
OUTSTANDING CUSTOMER SERVICE
AND EXCELLENT VALUE

j. In reference (m), Mr. Tooks stated that you admitted that gifts of wine were left at the store, and that you did not personally use or consume them, and that gifts of certain monetary value are exempt from the regulation.

Answer: You admitted to Mr. Imrie, reference (c), that you received numerous bottles of wine from local vendors, including Banfi. There are limitations on the use of exceptions when the frequency of gifts from the same or different sources are so frequent that a reasonable person would believe that the person is using his position for private gain. There is no indication that vendors provided all NEX employees with the same consideration that was provided to you, the General Manager. Also, the regulation prohibits the acceptances of gifts, not their disposition after wrongly received.

k. In reference (l), Mr. Tooks stated that the special orders wine you received were paid for in a timely manner and were in compliance with the "European Special Order Program."

Answer: Accepting that it was proper to make special orders of wine in Europe, your statement that you paid for them in a timely manner is not accepted. In reference (c), you admitted to Mr. Imrie that you made special orders of wine, would place them in a locked area of the warehouse, and remove them and pay for them in small quantities. Your statement to Mr. Imrie is consistent with the statement Ms. Larrabee attributes to you in reference (e). Ordering the wine, storing the wine in the warehouse, and purchasing it later in small quantities is not paying for it in a timely manner.

l. In reference (m), you note that in Mr. Shirley's statement, reference (f), he stated that he never recalled that he had specifically told you not to give NEX gift certificates to Local Nationals.

Answer: In reference (c), Mr. Imrie reported that you stated to him that Mr. Shirley may have authorized you to give Local Nationals NEX gift cards. In reference (f), Mr. Shirley stated that he never authorized you to give gift certificates to Local Nationals. Mr. Shirley went on to state that Local Nationals could be given cash awards. Mr. Shirley also stated that this was discussed at General Manager meetings attended by you, and he was surprised that you would even consider giving gift certificates to Local Nationals instead of cash awards. It should be noted that you did not deny Mr. Gialanella's statement, reference (g), that he told you not to give NEX gift certificates to Local Nationals.

m. In reference (m), you denied the statement attributed to you in reference (c) by Mr. Imrie concerning the purchase of jackets, acceptance of wine from local venders, and the purchase of special orders of wine for yourself.

Answer: Your subsequent denial of the admissions you made to Mr. Imrie does not persuade me that you did not make the admissions. Although you deny the statement

attributed to you by Mr. Imrie, you provided no reason to explain why Mr. Imrie would lie about what you told him, or make something up that was not true. Mr. Imrie is the Director of Loss Prevention for the Navy Exchanges in the United States, and has nothing to gain by falsely reporting what you told him. In view of the foregoing, I must accept the statement of Mr. Imrie, as to what you told him, and not your denial of the statements.

5. In arriving at this decision, I have considered the relevant factors contained in reference (b). I find that your actions, as you described them to Mr. Imrie, are inconsistent with the standards of conduct expected of a Branch Exchange Manager.

6. You may appeal this action in accordance with reference (b) by submitting a written appeal to Captain Anthony E. Gaiani; Naval Base Coronado, P.O. Box 357033, San Diego, CA 92135-7033 within 15 calendar days after receipt of this notice. You are entitled to a representative of your choice, and one formal hearing at that step. Your appeal must state the nature of the problem, the reasons for the appeal and the corrective action desired. Should you desire a hearing, you must state your request in the appeal. Failure to do so will preclude you from requesting a hearing at a later date. Should you wish to pursue the matter further, Step 2 of the appeals procedure is the Commander, Navy Exchange Service Command. No hearing is held at that level. You may obtain further information on the appeals procedure by contacting Ms Diana Gagnon-Hoskinson, Human Resources Manager, at (619) 237-5608.

7. You may file a discrimination complaint, if you feel that this action is being taken on the grounds of race, color, religion, national origin, sex, age, disability, or reprisal for engaging in prior EEO protected activity. You must initiate the informal EEO process within 45 calendar days from the effective date of this notice. You may obtain further information on this procedure by contacting Ms. Gwendolyn Marlow, Director of Diversity and Equal Employment Opportunity, at (757) 440-4739.

THOMAS P. JACOBSEN

# EXHIBIT
# 12

LAW OFFICES OF
LLOYD EDWARD TOOKS
*Attorney at Law*

*Mailing Address:*
*P.O. Box 153096*
*San Diego, California 92195-3096*

*(619) 264-6895*
*(619) 262-3310 [Fax]*

July 11, 2008

From : Mr. Timothy D'Angelo, by and through his attorney and representative Lloyd Edward Tooks

To : Captain Anthony E. Gaiani, Naval Base Coronado, P.O.Box 357033, San Diego, CA 92135-7033

Subj. : WRITTEN APPEAL OF DECISION TO TERMINATE EMPLOYMENT

By a Notice of Decision of Disciplinary Action ("Notice of Decision"), dated 1 July 2008 and received July 3, 2008, Mr. Timothy D'Angelo ("Mr. D'Angelo") was notified of the decision to terminate his employment with the Navy Exchange ("the Exchange") effective July 6, 2008. **Mr. D'Angelo hereby appeals the termination of his employment pursuant to Navy Exchange Manual, Vol. 3, Pub, 145, Chapter V.**

Mr. D'Angelo's termination was based on the following four charges:

1. Giving Navy Exchange gift certificates to local nationals;
2. Taking an unauthorized discount;
3. Accepting gifts from vendors; and
4. Making unauthorized special orders.

Each of the charges is based on alleged conduct that occurred while Mr. D'Angelo was General Manager of the Navy Exchange store in La Maddalena, Italy, between September 2003 and September 2006 -- twenty-two months or more prior to the February 13, 2008 date on which disciplinary action was initiated against him.

The reasons, and grounds, for this appeal may be summarized as follows:

(a) The suspension of Mr. D'Angelo prior to his termination, for over three months without pay and without a hearing, violated his constitutional right to

due process, and evidenced a motivation for his termination other than the misconduct alleged.

(b) The decision to terminate Mr. D'Angelo is not supported by substantial evidence.

(c) Even if the charges against Mr. D'Angelo were true in all respects, based on all relevant factors – including but not necessarily limited to his exemplary employment history, the lack of prior disciplinary action, and the fact that he received no personal benefit or gain from the alleged misconduct – the ultimate penalty of termination is intolerably excessive.

(d) The investigation that resulted in the charges against Mr. D'Angelo, and the process by which it was determined that he should be terminated, were materially flawed.

REASONS FOR THE APPEAL

**A. Mr. D'Angelo's Navy Exchange Employment History.**

Mr. D'Angelo's employment history with the Navy Exchange is summarized and **attached hereto as Exhibit A.** During his tenure he received promotions, and annual performance ratings that were fully successful or higher. He also received an award for his FY 2001 performance. Prior to his termination, Mr. D'Angelo had received no disciplinary action at all. This absence of prior discipline is one of the significant factors that counsel against the ultimate penalty of termination. Another of the significant factors is Mr. D'Angelo's performance during the sixteen months immediately preceding his suspension and termination. Based on his performance during that period he received two promotions; one from Division Manager at NEX North Island to Branch manager at NEX Imperial Beach, and a second one from Branch Manager at the single Imperial Beach location to Branch Manager of three locations - Imperial Beach, NAB, and Surf Mart. We respectfully submit that this is dispositive proof that, if reinstated, Mr. D'Angelo's would be an asset – not a detriment – to the Navy Exchange System. And, in the Notice of Decision, the Exchange does not argue, or offer evidence that would tend to prove, otherwise.

**B. The Suspension of Mr. D'Angelo Without Pay Violated His Constitutional Right To Due Process And The Navy Exchange Manual.**

Prior to terminating Mr. D'Angelo's employment the Exchange, by and through its General Manager Tom Jacobsen ("Mr. Jacobsen"), suspended Mr. D'Angelo without pay for over three months. And the charges upon which the suspension was based are the same four charges upon which Mr. D'Angelo's termination was based. As evidenced by the following facts and authority, the suspension was imposed and maintained by Mr. Jacobsen – the same person who made the decision to terminate Mr. D'Angelo – in a manner that violated both the Navy Exchange Manual and Mr. D'Angelo's constitutional right to due process. These violations are directly related to this appeal because they support Mr. D'Angelo's contention that it was the intent of the Exchange, from the very beginning, to terminate his employment – either by keeping him in "limbo" [suspended without pay] until he was forced to resign and find another job, or by terminating him.

1. Relevant Facts Regarding The Suspension.

In a memorandum dated 13 February 2008, Mr. Jacobsen confirmed that Mr. D'Angelo had been placed on an emergency indefinite suspension without pay, but did not tell him what conduct or action on his part prompted the suspension. **See Exhibit B attached hereto.** The suspension without pay continued for a period in excess of thirty (30) days, and the Exchange neither advised Mr. D'Angelo of the conduct on which the suspension was based nor disclosed to him any documents that allegedly supported the suspension. Therefore, on March 21, 2008, Mr. D'Angelo appealed the suspension pursuant to the applicable provisions of the Navy Exchange Manual, Vol. 3, Pub 145, Chapter V. **See Exhibit C attached hereto.** In his appeal letter Mr. D'Angelo requested that he be provided (i) a statement of the alleged conduct upon which the suspension was based, (ii) the documents that allegedly supported the suspension, and (iii) a statement explaining why it had been "determined that [his] retention might be detrimental to the interests of the Navy Exchange." There was no response to this request. And, by memorandum dated April 4, 2008, Mr. Jacobsen summarily denied Mr. D'Angelo's appeal. **See Exhibit D attached hereto.**

In a letter dated April 8, 2008, Mr. Jacobsen was asked to provide a copy of any provision of the Navy Exchange regulations that permitted the Exchange to "deny" an appeal in the manner that Mr. D'Angelo's appeal had been denied. See **Exhibit E attached hereto.** There was no response to this request either.

When the Navy Exchange did not respond to the April 8 request, or otherwise communicate with Mr. D'Angelo following that request, on April 21, 2008, Mr. D'Angelo commenced a legal action in federal court in San Diego challenging his indefinite suspension without pay and the summary denial of his appeal. Thereafter, on May 23, 2008, Mr. Jacobsen issued Mr. D'Angelo a notice of his [Mr. Jacobsen's] proposal to terminate Mr. D'Angelo's employment. See **Exhibit F attached hereto.**

2. Legal Violations Regarding The Suspension.

The suspension of Mr. D'Angelo without pay "infringe[d] on a protected property interest and thus trigger[ed] due process protections" (*Mustafa v. Clark County School District*, 157 F.3d 1169, 1177, n. 8 (9th Cir. 1998). See also, *Qualls v. Cook*, 245 Fed.Appx., 2007 WL 2326163, **2 (9th Cir. 2007); *Gilbert v. Homar*, 117 S.Ct. 1807, 1811 (1977). The Exchange violated Mr. D'Angelo's constitutional right to due process in ways that include, but are not necessarily limited to, the following:

(a) The February 13, 2008 memorandum confirming his suspension did not include the conduct or action by Mr. D'Angelo that prompted the suspension. See *Mustafa, supra* at 1172 ("The Notice [of suspension] set forth M.'s allegations of sexual misconduct [on which the suspension was based]).

(b) The Exchange denied Mr. D'Angelo's appeal of his suspension without (i) advising him of the conduct or action that prompted his suspension, (ii) granting him the opportunity to submit documentary evidence and a written response to the charges on which the suspension was based, and (iii) granting him a post-suspension hearing [see *Gilbert, supra* at 1811 ("So long as the suspended employee receives a sufficiently prompt post-suspension hearing, the lost income is relatively insubstantial"); *Mustafa, supra* at 1177 ("Mustafa was promptly afforded a hearing five days following the suspension.")].

(c) The Exchange violated Chapter V of its Manual in ways that include the following.

(i) Since Mr. D'Angelo was suspended "for more than 30 days", he had to be given an "[o]pportunity to review all evidence relied upon to support the reasons for the [suspension]" (**Exhibit H, p. 2, attached hereto**). He was not given this opportunity.

(ii) "An emergency suspension without pay which extends for 31 calendar days or more may be appealed" (*Id*). Mr. D'Angelo's appeal was denied without granting him the opportunity the submit written opposition to the suspension.

(iii) As part of an appeal, an employee has "[t]he right to one formal hearing, if the [employee] requests, to ascertain and consider the facts upon which the disciplinary action was taken and the reasons the [employee] feels the decision should be reversed. . . . The [employee] shall be given the opportunity to submit evidence and the testimony of witnesses, cross-examine witnesses, and present appropriate affidavits and depositions" (*Id* at p. 5). Mr. D'Angelo was not given such a hearing.

Finally, Mr. D'Angelo's indefinite suspension without pay was alleged to be justified because his "retention might be detrimental to the interests of the Navy Exchange" (**Exhibit B, para. 1**). **See also Exhibit H, p. 2.** However, the Exchange never explained why, based on the four charges, Mr. D'Angelo's retention – *twenty-two months or more after the conduct in question occurred* – might have been detrimental to the interests of the Navy Exchange. As previously noted, the Exchange even summarily denied Mr. D'Angelo's appeal of the suspension without responding to his request for such an explanation. **See Exhibit D, p. 2.** Clearly, not every charge of misconduct automatically justifies an emergency indefinite suspension without pay; not even every charge that, if ultimately proven, would justify the employee's termination.

**C. Even If The Charges Against Mr. D'Angelo Were True The Ultimate Penalty Of Termination Is Excessive.**

The standard of review in determining whether the charges against Mr. D'Angelo

were sufficiently proven is "substantial evidence" (Exhibit H, p. 6). Herein below we reference evidence, and set forth points and authority, demonstrating that the charges were not supported or proven by substantial evidence. However, we believe that it is appropriate to first note that, even if the four charges upon which Mr. D'Angelo's termination was based were true, the termination penalty was intolerably excessive.

Based on the charges, and Mr. D'Angelo's undisputed related actions, he did the following:

(a) in public presentations or ceremonies, he gave Navy Exchange gift certificates to local national associates for the sole purpose of recognizing and rewarding their good performance, when he was not authorized to do so;

(b) he purchased leather jackets at a price point of $10.00, and later returned the jackets, obtained a refund and purchased the jackets at their regular selling price;

(c) he received bottles of wine from local vendors, which bottles of wine were not personally consumed or used by Mr. D'Angelo, but remained in the NEX store and were used as customer door prizes during NEX store events; and

(d) he special ordered cases of wine, locked them in the warehouse, and purchased them a few bottles at a time.

To the extent that this conduct might require that Mr. D'Angelo suffer discipline any disciplinary action deemed necessary would have to be appropriate, and not excessive. And, in determining what disciplinary action might be appropriate, the violations themselves must not be considered in isolation. [This, in fact, is exactly what the Exchange did in determining that Mr. D'Angelo should be terminated] Other relevant, mitigating, factors must also be considered, including (i) Mr. D'Angelo's exemplary Navy Exchange employment history, (ii) the absence of prior disciplinary action, and (iii) the fact that he neither sought nor received any personal benefit or gain from the conduct in question. We respectfully submit that, if both the alleged misconduct and the mitigating factors were fairly considered the penalty of termination would not be appropriate.

**D. The Relevant Facts Concerning Each Charge Demonstrate Either The Lack Of Merit In The Charge Or The Excessiveness Of The Termination Penalty.**

1. Gift Certificates To Local Nationals.

The following facts are undisputed by both the Exchange and Mr. D'Angelo.

(a) The only gift certificates Mr. D'Angelo authorized be given to local nationals were awarded to local national associates, employed at the NEX store in La Maddelana, as recognition for performance.

(b) Mr. D'Angelo received no personal benefit, monetary or otherwise, from the awarding of the gift certificates to the local national associates.

(c) The awarding of the gift certificates to the local national associates was done publicly, and occasionally was a part of a ceremony attended by the Commanding Officer, Executive Officer, European District Manager, or other NEX official.

Mr. D'Angelo does not deny that he authorized the awarding of gift certificates to local national associates employed at the NEX store. However, he contends that, based on the following relevant circumstances, if disciplinary action is deemed appropriate, it should be something far less than termination. First, Mr. D'Angelo honestly believed that he was authorized to award the gifts certificates to the local national associates as recognition for performance. Dispositive proof of his belief in this regard is established by the fact that the gift certificates were awarded publicly, and in the presence of military officials [the Commanding Officer or Executive Officer] and/or NEX officials [European District Manager, etc.]. Certainly no person would intentionally, and repeatedly, engage in wrongdoing publicly and in the presence of his/her military and civilian superiors. Also, when, long before the matter became the subject of an investigation, he was asked about the awarding of the gift certificates to the local national associates, Mr. D'Angelo told his successor at the La Maddelana store, Linda Larrabee, that he was authorized to do so. **See Exhibit G attached hereto, p. 2.** Again, he would not have said this to Ms Larrabee if he did not at least believe it to be true.

Second, no disciplinary action was issued to Mr. D'Angelo, for authorizing the

award of gift certificates to local national associates, *during the time he was in La Maddelana authorizing the award of the certificates.* Therefore, if it is appropriate to punish him now – over twenty-two months after-the-fact – for conduct that was knowingly permitted as it occurred, that punishment should certainly not be termination.

Third, Mr. D'Angelo did not benefit personally – monetarily or otherwise – from the awarding of the gift certificates to the local national associates. See *Seas v. U.S. Postal Service*, 73 M.S.P.R. 422, 427 (1997) ("the absence, presence, or amount of gain, financial or otherwise, may be a factor in assessing the reasonableness of the penalty for an act of falsification").

The Exchange obtained a written statement from Eugenio Gialanella ("Mr. Gialanella"), the Exchange's Financial Manager, District Europe. Mr. Gialanella stated that, in January 2005, he saw Mr. D'Angelo give gift certificates of $10.00 to local national associates. When he asked Mr. D'Angelo why he did so Mr. D'Angelo said the purpose was to recognize performance. Mr. Gialanella stated that he then reminded Mr. D'Angelo "that it was not legal to recognize a well done job with NEX Gift Certificates to [local national] Associates since they cannot purchase at the Exchange." Mr. Gialanella further stated that Mr. D'Angelo responded by stating that "he was authorized by the local CO to let the [local national] Associates use the Gift Certificates for small purchases at the Exchange." *This statement regarding authorization by the local CO has never been disputed.*

2. Taking an Unauthorized Discount.

The second charge upon which Mr. D'Angelo's termination was based is the purchase of "leather jackets at the NEX at a price point of $10.00, a price significantly under the regular retail selling price" (**Exhibit G, p. 2**). Mr. D'Angelo has denied this charge, and produced (1) a copy of the $140 receipt for the one and only leather jacket he purchased at the NEX in La Maddelana, and (2) his declaration and the declaration of his wife describing the purchase of the jacket. **See Exhibits I and J, attached hereto.**

The standard of review applicable to this charge is "substantial evidence"; and "[s]ubstantial evidence is defined as such relevant evidence as a reasonable mind might

accept to support a conclusion" (**Exhibit H, p. 6**). The relevant evidence proffered by the Exchange regarding the unauthorized discount charge does not meet this standard.

As support for this charge the Exchange cited two things: (1) a representation by David Imrie ("Mr. Imrie"), NEXCOM Director of Loss Prevention/Safety as to what a confidential witness said during an interview, and (2) a representation by Mr. Imrie that Mr. D'Angelo verbally admitted the charge during an interview. When Mr. D'Angelo objected to the Exchange's reliance on information allegedly provided by a confidential witness, the Exchange responded by stating, "[t]he evidence relied on to support the charge of purchasing jackets for $10.00 was based on [Mr. D'Angelo's] admission, not the statement of a confidential witness" (**Exhibit G, p. 4**). However, the uncorroborated, and otherwise unsupported, statement of Mr. Imrie that Mr. D'Angelo admitted the charge does not constitute substantial evidence -- especially since Mr. D'Angelo has expressly denied the charge in a sworn statement. **See Exhibit J.** See also *Roberts v. Dept. of the Treasury*, 8 M.S.P.R. 674, 679 (1981) (due process concerns "raise the question of whether a mere unsworn admission of misconduct, in the absence of any independent evidence tending to establish that the misconduct was actually engaged in, can be found to satisfy even a substantial evidence standard."); *Garibay v. Veterans Administration*, 35 M.S.P.R. 327, 333 (1987) ("an extrajudicial admission is not conclusive on the party who made it or to whom it is attributable; in the absence of the elements of estoppel, such an admission may be explained, rebutted, or contradicted.").

3. Accepting Gifts from Vendors.

Mr. D'Angelo's termination was also based on a charge that he "received numerous bottles of wine from local vendors, including Banfi" (**Exhibit G, p. 2**). The only proffered support for this charge is, again, Mr. Imrie's allegation that Mr. D'Angelo admitted the charge. **See Exhibit G, p. 2.** Again, however, Mr. Imrie's allegation of a verbal, unsworn, admission is uncorroborated and therefore cannot constitute substantial evidence. See *Roberts* and *Garibay, supra.*

Moreover, Mr. D'Angelo's statement of the relevant facts is undisputed.

(a) Vendors did, on occasion, leave a gift bottle of wine in the Exchange store.

(b) Each such "gift" bottle of wine was turned over to the Cash Office and stored until it was used as a customer door prize during a store event.

(c) Mr. D'Angelo never personally received a gift bottle of wine from a vendor, never consumed a gift bottle of wine from a vendor, and never even removed such a gift bottle of wine from the Exchange store or otherwise personally used such a gift.

**See Exhibit J, para. 5.**

In response to Mr. D'Angelo's statement that, to his knowledge, the gift bottles of wine left by vendors also fell within the gift exception set forth in 5 CFR §2635.204(a), the Exchange stated, "[t]here are limitations on the use of exceptions when frequency of gifts from the same or different sources are so frequent that a reasonable person would believe that the person is using his position for private gain" (**Exhibit G, p. 3**). However, this statement was first asserted "after-the-fact"; i.e., in the Notice of Decision (Exhibit G), and *after* Mr. D'Angelo responded to the proposal to terminate him. Moreover, Mr. D'Angelo's statement that he never consumed, removed, or otherwise personally used any gift bottle of wine from a vendor is undisputed; and *there are no facts or evidence that the vendors' gift bottles of wine were, <u>in fact</u>, left so frequently "that a reasonable person would believe that [Mr. D'Angelo was] using his position for private gain."*

4. <u>Making Unauthorized Special Orders</u>.

The final charge upon which Mr. D'Angelo's termination was based alleges that "on numerous occasions [he] special ordered cases of wine, locked them in a locked area of the warehouse, and then later [he] purchased them [himself] a few bottles at a time" (**Exhibit G, p. 2**). Again, Mr. Imrie alleged that, during his interview, Mr. D'Angelo verbally "acknowledged" the accuracy of the charge. Again, however, Mr. D'Angelo's sworn statement belies any such acknowledgment. **See Exhibit J, para. 6.**

Moreover, the violative conduct alleged in the proposal to terminate Mr. D'Angelo does not appear to be the same as the violative conduct alleged in the Notice of Decision. In the termination proposal (**Exhibit F**) two kinds of violative conduct are alleged. One, based on Linda Larrabee's statement, it is alleged that Mr. D'Angelo did not pay for his

last special order of wine. *Id*, at p. 2. Two, based on a special order instruction referenced in the termination proposal, it is alleged that Mr. D'Angelo special ordered an item – wine – that was not authorized in the instruction. *Id.*

In his response to the termination proposal Mr. D'Angelo noted that, while he was working in La Maddelana, the special ordering of wine was permitted pursuant to a uniquely European special order program. **Exhibit J, para. 6.** In the Notice of Decision the Exchange "[a]ccept[ed] that it was proper to make special orders of wine in Europe" (**Exhibit G, p. 5, para. k**). Also, Mr. D'Angelo produced a receipt showing that he did, in fact, pay for his last special order of wine. See copy of receipt attached to **Exhibit J.**

Since Mr. D'Angelo rebutted the violative conduct alleged in the proposal to terminate his employment, the Notice of Decision alleged a third kind of violative conduct – paying for special orders of wine "in small quantities" rather than paying for the complete special order at one time. See **Exhibit G, p. 5, para. k.** Our response is two-fold. First, Mr. D'Angelo has denied that he special ordered bottles of wine, stored the bottles in the NEX store and then purchased them a few bottles at a time. He states, "I purchased and took delivery of my special orders complete, and in a timely fashion. I never partially purchase[d] a special order" (**Exhibit J, para. 6**). Mr. D'Angelo's statement in this regard is supported by the receipt showing his complete purchase of his final special order of wine in the amount of $566.40. See copy of receipt attached to **Exhibit J.** Second, the Exchange has cited no instruction or rule that would have been violated even if Mr. D'Angelo had paid for his special orders "in small quantities."

**E. The Investigation And Process By Which It Was Determined That Mr. D'Angelo Should Be Terminated Were Materially Flawed.**

As a general principle, the only disciplinary action an employee deserves to receive is disciplinary action meted out in accordance with (1) the established procedures of the employer and (2) applicable law. In Mr. D'Angelo's case the Exchange violated both.

First, as described above, the Exchange violated Mr. D'Angelo's constitutional right to due process, and applicable provisions of its Manual, in imposing and

maintaining Mr. D'Angelo's indefinite suspension without pay.

Second, the information on which the charges concerning the leather jacket purchases and the special orders of wine were based came from a confidential witness whose identity was never disclosed to Mr. D'Angelo. As noted herein above, the use of the confidential witness' information violated Chapter V of the Navy Exchange Manual and SECNAVINST 5300.22C which required that Mr. D'Angelo be permitted to review all evidence [including the identity of witnesses] relied on by the Exchange. The use of that information also violated Mr. D'Angelo's right to due process. As also noted above, the Exchange argues that "[t]he evidence relied on to support the charge of purchasing jackets for $10.00 was based on [Mr. D'Angelo's] admission, not the statement of a confidential witness" (**Exhibit G, p. 4**). This argument is specious at best. The information concerning the leather jacket purchases, as well as the special orders of wine, was initially communicated to Navy Exchange investigative personnel by the confidential witness. If the confidential witness had not communicated that information the Navy Exchange investigative personnel, including Mr. Imrie, would not have been aware of it, and Mr. Imrie would not have asked questions about those matters during his interview of Mr. D'Angelo. And if Mr. Imrie had not made those inquiries during the interview there would be no question that Mr. D'Angelo did not admit those charges as Mr. Imrie alleges.

Third, Mr. Jacobsen made all the decisions regarding Mr. D'Angelo's suspension and termination. He imposed the indefinite suspension without pay. See **Exhibit B**. He summarily denied Mr. D'Angelo's appeal of that suspension and refused to explain why the retention of Mr. D'Angelo might be detrimental to the interests of the Navy Exchange. See **Exhibit D**. He proposed that Mr. D'Angelo be terminated. See **Exhibit F**. And he made the decision to terminate Mr. D'Angelo. See **Exhibit G**. It is certainly not an exaggeration to say that Mr. Jacobsen's actions in this matter were akin to the actions of a prosecutor, judge, and jury, all done by one person. Whether or not Mr. Jacobsen harbored any personal preferences or prejudices, he should not have been assigned the functions of imposing the suspension and proposing the termination, *and*

*also* the functions of making the decision on the appeal of the suspension and making the ultimate termination decision.

CORRECTIVE ACTION DESIRED

Mr. D'Angelo requests the following corrective action:

1. Retroactive reinstatement to the employment position from which he was terminated, with all of its benefits, rights and privileges, and any added benefits or increases he would have obtained had he not been suspended and terminated;

2. Back pay from the effective date of his suspension to the date of his reinstatement;

3. Compensation for any insurance, health, or other costs incurred as a result of his suspension and termination; and

3. Attorney fees and costs incurred in responding to the suspension and termination.

CONCLUSION

As noted herein above, Mr. D'Angelo's performance for over a year immediately preceding his suspension and termination demonstrated what an asset he continued to be as a Navy Exchange employee. We respectfully submit that this fact, and the other points and authority set forth herein above, prove that Mr. D'Angelo's termination was an excessive penalty.

LLOYD EDWARD TOOKS

Attorney for Timothy D'Angelo

# EXHIBIT 13

LAW OFFICES OF
**LLOYD EDWARD TOOKS**
*Attorney at Law*

**Mailing Address:**
**P.O. Box 153096**
**San Diego, California 92195-3096**

(619) 264-6895
(619) 262-3310 [Fax]

July 14, 2008

Captain Anthony E. Gaiani
Commanding Officer
Naval Base Coronado
P.O. Box 357033
San Diego, CA 92135-7033

Re: Timothy D'Angelo's Appeal of His Termination

Dear Captain Gaiani:

Submitted herewith is Mr. Timothy D'Angelo's written appeal of the termination of his employment effective July 6, 2008.

While Mr. D'Angelo does not request a hearing as a part of his appeal, he respectfully requests the opportunity to meet with you in person, for no more than fifteen minutes, to orally supplement his written appeal, and to respond to any questions you might have after reviewing the written appeal.

Thanking you for your consideration, I remain,

Yours in closing,

LLOYD EDWARD TOOKS

cc: Mr. Timothy D'Angelo
LET:rwt